# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ROBERT W. BAKER, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : Civ. No. 05-719-LPS |
| | : |
| MICHAEL J. ASTRUE,[1] | : |
| Commissioner of Social Security, | : |
| | : |
| Defendant. | : |

William Schab, SCHAB & BARNETT, P.A., Wilmington, Delaware, Attorney for Plaintiff.

Colm F. Connolly, United States Attorney, and David F. Chermol, Special Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Wilmington, Delaware; Donna L. Calvert, Regional Chief Counsel, SOCIAL SECURITY ADMINISTRATION, Philadelphia, Pennsylvania, Attorneys for Defendant.

## MEMORANDUM OPINION

January 10, 2008
Wilmington, Delaware

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security. Accordingly, pursuant to Fed. R. Civ. P. 25(d)(1), Michael J. Astrue is substituted for the former Commissioner Joanne B. Barnhart.

*[signature]*

**STARK, U.S. Magistrate Judge**

## I. INTRODUCTION

Plaintiff Robert W. Baker ("Baker") appeals from a decision of Defendant Michael J. Astrue, the Commissioner of Social Security ("Commissioner"), denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-33. The Court has jurisdiction over this matter pursuant to 42 U.S.C. § 405(g).

Presently pending before the Court are cross-motions for summary judgment filed by Baker and the Commissioner. (D.I. 9,10) Baker's motion for summary judgment asks the Court to award him DIB or, alternatively, remand the case for further proceedings before the Commissioner. (D.I. 9) The Commissioner's motion for summary judgment requests that the Court affirm his decision and enter judgment in his favor. (D.I. 10) For the reasons set forth below, Baker's motion for summary judgment will be denied and the Commissioner's motion for summary judgment will be granted.

## II. BACKGROUND

### A.   Procedural History

Baker's initial DIB application was filed on December 1, 1995 and denied on December 14, 1995. (D.I. 15 ("Transcript" and hereinafter "Tr.") at 114-21) Baker did not, and does not, seek judicial review of the denial of his initial application. Tr. at 18.

Baker filed the application for DIB at issue in this case on July 10, 1996. Tr. at 122-25. That application was denied initially on October 3, 1996 and again denied on reconsideration on February 7, 1997. Tr. at 126-29, 133-36. After a hearing, an administrative law judge (ALJ) issued a decision on June 23, 1998 denying benefits. Tr. at 99-113, 333-42. On October 8, 2000, the

1

Appeals Council vacated and remanded the ALJ's decision so that specific vocational expert testimony could be received regarding which, if any, jobs an individual with Baker's vocational characteristics and residual functional capacity could perform. Tr. at 345-47. A second hearing was held on May 15, 2001 and, on April 24, 2002, a second ALJ issued a decision denying benefits. Tr. at 82-98, 357-62. On October 29, 2003, the Appeals Council again remanded the case, this time because the vocational expert had not been asked whether his testimony conflicted with the contents of the *Dictionary of Occupational Titles*. Tr. at 393-95.

A third hearing was conducted, before yet another ALJ, on September 30, 2004. Tr. at 34-81. Baker, who was represented by counsel, testified, as did Baker's wife and a vocational expert. *Id.* On November 30, 2004, the ALJ issued a decision denying benefits. Tr. at 18-29. On August 5, 2005, the Appeals Council denied Baker's request for review. Tr. at 7-9. Thus, the ALJ's November 30, 2004 adverse decision became the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.955, 404.981; *see also Sims v. Apfel*, 530 U.S. 103, 107 (2000).

On October 6, 2005, Baker filed a Complaint seeking judicial review of the ALJ's November 30, 2004 decision. (D.I. 1) On March 13, 2006, Baker moved for summary judgment. (D.I. 9) The Commissioner filed a cross-motion for summary judgment on April 24, 2006. (D.I. 10) Thereafter, on December 20, 2007, the parties consented to the jurisdiction of a United States Magistrate Judge. (D.I. 19)

**B.  Factual Background**

    **1.  Plaintiff's Medical History, Treatment, and Condition**

At the time he filed the relevant DIB application in July 1996, Baker was 40 years old. Tr. at 122. He has a high school education. Tr. at 29. He had worked as a painter, painter contractor,

hatchery worker, and general maintenance worker. Tr. at 72.

Baker claims to have been disabled since April 1, 1995 due to "nerve damage to both of his legs, both of his arms, and both of his hands." Tr. at 18.[2] His claimed disability arises from several physical problems. Apparently as the result of a gunshot wound he suffered well before 1995, shotgun pellets affected Baker's lumbar spine and resulted in nerve damage to his right leg. Tr. at 201-202, 211, 232. Medical examination documented atrophy of the right quadriceps complex, with no real strength in the quadriceps or dorsiflexors on the right. Tr. at 233, 300. The right quadriceps was four inches smaller than the left and Baker's walk was once described as being marked by "a right foot drop with a slap gait." Tr. at 233, 281. Dr. Peter Coveleski, a specialist in physical medicine and rehabilitation, indicated significant ambulatory dysfunction because of the damage to the right lower leg. Tr. at 233-34. An October 1997 EMG of Baker's lower extremities documented "widespread EMG and nerve conduction abnormalities most probably consistent with damage to the lumbar plexus." Tr. at 305.

Baker has pain in his lower back, apparently associated with the leg weakness. An X-ray performed in October 1995 showed marked degenerative changes in the lower lumbar facet joints with prominent osteophytes present at L3-L4. Tr. at 204. An MRI documented mild degenerative disc disease at L3-4 and L4-5 with a posterior bulge. Tr. at 265.

On examination, in April 1996, Baker demonstrated a mild to moderately impaired vibratory sense in both feet. Tr. at 266. He also has pain in his right knee and x-rays showed a lowered

---

[2]The relevant time period in this case began on December 15, 1995, the day after the prior binding denial of benefits. Tr. at 118-21. The last day upon which Plaintiff was insured for purposes of DIB was December 31, 1999. Tr. at 158, 161, 348. Accordingly, to receive DIB, Baker has to prove he was disabled as of some date between December 15, 1995 and December 31, 1999. *See* 42 U.S.C. §§ 423(a)(1)(A), (c)(1)(B); 20 C.F.R. §§ 404.101(a), 404.131(a).

3

kneecap (patella baja). Tr. at 205, 303.

Baker also has problems with his upper extremities, which began with numbness, weakness and pain before he stopped working in 1995. Tr. at 268. In 1996, examination documented atrophy of some left hand muscles along with weakness. Sensation testing showed a decrease to pain and vibratory sense in the ulnar distribution of both hands. Deep tendon reflexes were asymmetric in the upper extremities with the right biceps absent, the brachioradialis trace and the triceps +1. On the left, both the brachioradialis and biceps were +1 and triceps was +2. Tr. at 268.

An MRI of Baker's cervical spine confirmed cervical stenosis from C4-5 through C6-7 with a small disc bulge at C56-6 compressing the spinal cord. The nerve root canals also appeared narrowed at these levels, but predominantly at C5-6 and C6-7. Tr. at 267. In May 1996, Baker underwent a decompressive cervical laminectomy C3 to C7. Tr. at 271. This procedure did not resolve all of Baker's problems. Four months after surgery, he still reported that he had problems with his right and left hands, noting he frequently dropped things. Tr. at 280. There continued to be atrophy of the left hand muscles and a reduced sensation bilaterally in the ulnar root distribution. Tr. at 281.

The damage to the left hand progressed. Baker was examined by Allan Joel Belzberg, M.D., at The Johns Hopkins Hospital in September 1997. Baker reported increasing numbness as well as achiness in the arms with a sensation like electric shocks in his fingers. Tr. at 327. He noted bilateral arm weakness and reported that he dropped things all the time. On examination, Dr. Belzberg noted a generalized atrophy and a slight decrease in motor strength in the left upper extremity. Dr. Belzberg recommended further studies. Tr. at 328. A cervical MRI showed multi-level mild to moderate neural foraminal narrowing as well as narrowing of the right to

left dimension of the spinal canal related to the previous position of the left-sided lamina. Tr. at 326. An EMG showed findings in both upper extremities consistent with multilevel cervical root disease that was more severe on the left. There were also abnormalities in both upper extremities consistent with ulnar nerve entrapment at the elbow, described as "very severe" on the left and "moderately severe" on the right. Tr. at 305. Dr. Belzberg recommended ulnar nerve transposition surgery. Tr. at 324.

Surgery was performed on Baker's left arm in November, 1997. Tr. at 321. Baker continued to show mild sensory disturbance in the distribution of the medial and brachiocutaneous nerve. The ulnar nerve remained quite compromised distally, "with obvious atrophy in the ulnar innervated muscles and very little two-point discrimination ability." Tr. at 317.

On the right arm, Dr. Belzberg noted a strong Tinel's sign at the elbow with some slight decrease in two-point discrimination in the ulnar nerve distribution with decreased pinprick sensation on the ulnar side of the right ring finger. *Id.* Dr. Belzberg recommended decompressing the right ulnar nerve as it was on its way "to becoming a problem like his left nerve is. Rather than allow progression, I think we should decompress it early." Tr. at 318. Surgery was carried out in February 1998. Tr. at 313. Examination still showed left hand ulnar-innervated muscle strength decreased with only Grade 0 to 1/5 strength in the dorsal interosseus muscle with notable atrophy. The right biceps reflex was absent. Both hands still showed some diminished sensation to pinprick. Fine touch was diffusely diminished bilaterally in the arms and entire hands in a symmetric distribution. The doctor concluded that Mr. Baker continued to have "considerable residual weakness in the left, nondominant hand." Tr. at 311.

### 2. The Administrative Hearing

At the most recent of Baker's administrative hearings, held on September 30, 2004, the ALJ heard the testimony of Baker, his wife Cheryl, and Dr. Adina Leviton, an impartial vocational expert. Tr. at 34-81.

#### a. Baker's Testimony

Baker testified that during the relevant period – from the date he claimed to be disabled, April 1, 1995, through his date last insured, December 31, 1999, Tr. at 37 – he had problems with his legs, back, and hands that severely limited his daily functioning. For example, Baker could only walk about 50 yards without holding onto something. Tr. at 51. He could not stand for more than one-half hour because of back pain. *Id.* If he sat for more than two hours his legs would go to sleep. *Id.* Even then he would need something to hold onto to get up from a sitting position because if his leg had fallen asleep (and he could not always tell if it had) he would lose his balance. Tr. at 51-52. When he would get up, he would have to move around, rather than just stand in place. Tr. at 52.

While Baker could drive a couple of times each week, for a total of about 50 miles, he could only drive for up to a half hour at a time. Tr. at 42. His trouble driving stemmed from the fact that his leg would go to sleep. Tr. at 40. He could not take his right foot off the accelerator (which would have required moving his whole body) to brake but had to, instead, use his left foot to brake. Tr. at 53-54.

Throughout the relevant time period, Baker explained, he was "losing more and more use of my hands, both of them, especially this [the left] one." Tr. at 42. Baker is right-handed; he had partial feeling in both hands all the time but less on the left side. Tr. at 54-55. As a result, he

6

testified, "I would drop things a lot of times. I would try to wash dishes or something like that and I would break glasses, cups, plates." Tr. at 55. He could lift, at most, eight or nine pounds, but he would drop things regardless of their weight. Tr. at 51, 67.

Baker could only hold a pen or pencil for a short period of time. Tr. at 55. He had difficulty picking up small objects with his hands. Tr. at 63-64. He also noted trouble trying to use a screwdriver. Tr. at 64. He had trouble cutting his food. Tr. 60, 64. Even buttoning a shirt would be a problem. Tr. at 67. However, Baker further testified that he could "fix myself a sandwich or something like that" and could watch television and pay attention. Tr. at 57. He could also "probably" put a key in the door and could turn a door knob with his right hand. Tr. at 64.

### b. Mrs. Baker's Testimony

Cheryl Baker testified that she had to cut her husband's meat for him. Tr. at 70. She noted that Baker wore T-shirts and could put them on and take them off without any problem. Tr. at 71. She added that Baker would regularly go to his children's games and wrestling matches. Tr. at 72.

### c. The Vocational Expert's Testimony

Dr. Leviton, the vocational expert, testified that if a person of Baker's age, education, and work experience were limited in the manner ultimately found by the ALJ, 50% of the unskilled sedentary occupational base would be eliminated. Tr. at 74. The vocational expert believed that such a person could still perform the job of charge account clerk, order clerk (food and beverage), and surveillance-system monitor. Tr. at 75. The expert added that nationally there were over 12,000 surveillance-system monitor jobs available, including 300 locally. Tr. at 75. The vocational expert indicated that her testimony was consistent with the *Dictionary of Occupational Titles* except that the *Dictionary of Occupational Titles* did not address the need to alternate sitting and standing.

7

Tr. at 75. On cross-examination by Baker's attorney, the expert testified that if manual dexterity were limited in both hands to the extent it was limited in the non-dominant (left) hand, "there would be no sedentary work" that Baker could do. Tr. at 78.

### 3. The ALJ's Findings

On November 30, 2004, after giving careful consideration to the entire record, the ALJ issued the following findings:

1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act, and is insured for benefits through December 31, 1999.

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability, April 1, 1995.

3. As of claimant's date last insured, December 31, 1999, the claimant's left hand disorder; cervical disk disease with neuropathy; right leg disorder (secondary to gunshot); right hand disorder; and lumbar disorder are considered to have been "severe," based on the requirements in the Regulations at 20 CFR § 404.1520(c).

4. On the claimant's date last insured, December 31, 1999, these medically determinable impairments did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. The claimant's allegations regarding his limitations are not fully credible, for the reasons set forth in the body of the decision.

6. On the claimant's date last insured, December 31, 1999, the claimant retained the residual functional capacity for the full range of sedentary work, diminished by the need for a sit/stand option at will, and limited ability to push and pull with one lower extremity; occasionally balancing, bending, stooping, kneeling, crouching, squatting, climbing stairs and ramps, but never ladders, ropes or scaffolds, or crawling. In the non-dominant (left) hand, there could be no repetitive reaching, handling, fingering, or feeling. The claimant should avoid concentrated exposure to cold and hazards. There was moderate limitation in the ability to concentrate, maintain attention for extended periods and keep up a pace, as a function of pain (20 CFR § 404.1567).

7. The claimant is unable to perform any of his past relevant work (20 CFR § 404.1565).

8. The claimant is a "younger individual" (20 CFR § 404.1563).

9. The claimant has a "high school education" (20 CFR § 404.1564).

10. The claimant has no transferable skills form any past relevant work (20 CFR § 404.1568).

11. On the claimant's date last insured, December 31, 1999, although the claimant's residual functional capacity cited in Finding #6 did not allow him to perform a full range of sedentary work, using Medical-Vocational Rule 201.28 as a framework for decision-making, there are a significant number of jobs in the national economy that he could have performed. Examples of such jobs include work in the following sedentary jobs: charge account clerk, order clerk/food and beverage, and surveillance system monitor.

12. On the claimant's date last insured, December 31, 1999, the claimant was not under a "disability," as defined in the Social Security Act (20 CFR 404.1520(g)).

Tr. at 28-29.

### III. STANDARD OF REVIEW

#### A. Motion for Summary Judgment

Both parties filed motions for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). In determining the appropriateness of summary judgment, the Court must "review the record taken as a whole . . . draw[ing] all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (internal citation and quotation marks omitted). If the Court is able to determine that "there is no genuine issue as to any material fact" and that the movant is entitled to judgment as a matter of law, summary judgment is appropriate. *Hill v. City of*

*Scranton,* 411 F.3d 118, 125 (3d Cir. 2005) (quoting Fed. R. Civ. P. 56(c)).

**B.      Review of ALJ Findings**

The Court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence." *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Monsour Medical Center v. Heckler,* 806 F.2d 1185, 1190 (3d Cir. 1986). "Substantial evidence" means less than a preponderance of the evidence but more than a mere scintilla of evidence. *See Rutherford v. Barnhart,* 399 F.3d 546, 552 (3d Cir. 2005). As the United States Supreme Court has noted, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 565 (1988).

In determining whether substantial evidence supports the Commissioner's findings, the Court may not undertake a *de novo* review of the Commissioner's decision and may not re-weigh the evidence of record. *See Monsour,* 806 F.2d at 1190. The Court's review is limited to the evidence that was actually presented to the ALJ. *See Matthews v. Apfel,* 239 F.3d 589, 593-95 (3d Cir. 2001). "Credibility determinations are the province of the ALJ and only should be disturbed on review if not supported by substantial evidence." *Pysher v. Apfel,* 2001 WL 793305 at *3 (E.D. Pa. Jul. 11, 2001).

The Third Circuit has explained that a "single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence – particularly certain types of evidence (e.g., that offered by treating physicians) – or if it really constitutes not evidence but mere conclusion." *Kent v. Schweiker,* 710 F.2d 110, 114 (3d Cir. 1983).

10

Thus, the inquiry is not whether the Court would have made the same determination, but rather, whether the Commissioner's conclusion was reasonable. *See Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988). Even if the reviewing court would have decided the case differently, it must give deference to the ALJ and affirm the Commissioner's decision if it is supported by substantial evidence. *See Monsour*, 239 F.3d at 1190-91.

## IV. DISCUSSION

### A. Disability Determination Process

Title II of the Social Security Act, 42 U.S.C. § 423(a)(1)(D), "provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from a physical or mental disability." *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). In order to qualify for DIB, the claimant must establish that he or she was disabled prior to the date he or she was last insured. *See* 20 C.F.R. § 404.131; *Matullo v. Bowen*, 926 F.2d 240, 244 (3d Cir. 1990). A "disability" is defined as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. *See* 42 U.S.C. §§ 423(d)(1)(A), 1382(c)(a)(3). A claimant is disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A); *Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003).

In determining whether a person is disabled, the Commissioner is required to perform a five-step sequential analysis. *See* 20 C.F.R. § 404.1520; *Plummer v. Apfel*, 186 F.3d 422, 427-28 (3d

11

Cir.1999). If a finding of disability or non-disability can be made at any point in the sequential process, the Commissioner will not review the claim further. 20 C.F.R. § 404.1520(a)(4).

At step one, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity. *See* 20 C.F.R. § 404.1520(a)(4)(I) (mandating finding of non-disability when claimant is engaged in substantial gainful activity). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a combination of impairments that is severe. *See* 20 C.F.R. § 404.1520(a)(4)(ii) (mandating finding of non-disability when claimant's impairments are not severe). If the claimant's impairments are severe, the Commissioner, at step three, compares the claimant's impairments to a list of impairments (the "listings") that are presumed severe enough to preclude any gainful work. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Plummer,* 186 F.3d at 428. When a claimant's impairment or its equivalent matches an impairment in the listing, the claimant is presumed disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii). If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to steps four and five. *See* 20 C.F.R. § 404.1520(e).

At step four, the Commissioner determines whether the claimant retains the residual functional capacity ("RFC") to perform her past relevant work. *See* 20 C.F.R. § 404.1520(a)(4)(iv) (stating claimant is not disabled if able to return to past relevant work); *Plummer,* 186 F.3d at 428. A claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Fargnoli v. Massanari,* 247 F.3d 34, 40 (3d Cir. 2001). "The claimant bears the burden of demonstrating an inability to return to her past relevant work." *Plummer,* 186 F.3d at 428.

If the claimant is unable to return to her past relevant work, step five requires the Commissioner to determine whether the claimant's impairments preclude her from adjusting to any other available work. *See* 20 C.F.R. § 404.1520(g) (mandating finding of non-disability when claimant can adjust to other work); *Plummer,* 186 F.3d at 428. At this last step, the burden is on the Commissioner to show that the claimant is capable of performing other available work before denying disability benefits. *See Plummer,* 186 F.3d at 428. In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and [RFC]." *Id*. In making this determination, the ALJ must analyze the cumulative effect of all of the claimant's impairments. *See id.* At this step, the ALJ often seeks the assistance of a vocational expert. *See id.*

### B. The ALJ's Decision is Supported by Substantial Evidence

On appeal, Baker presents two arguments: (1) at step five the Commissioner failed to meet his burden to prove the existence of jobs in the national economy that Baker could perform; and (2) the ALJ underestimated the extent of Baker's limitations on the use of his hands. As explained below, the Court finds substantial evidence to support the Commissioner on both of these points.

#### 1. There is Substantial Evidence that Baker Could Perform the Work of a Surveillance-System Monitor

The primary issue is whether the Commissioner met his burden at step five of the disability determination process by providing substantial evidence that there are jobs existing in significant numbers in the national economy which Baker can perform. The vocational expert concluded that, based on Baker's many limitations, Baker could perform 50% of the 200 recognized unskilled,

sedentary jobs available in the national economy. Tr. at 74. Based on this testimony and other evidence in the record, the ALJ concluded that among the jobs Baker could perform was that of surveillance-system monitor.

The Court finds that the record contains substantial evidence Baker had sufficient RFC, given the other relevant factors (e.g., Baker's age, education, past work experience) including all of Baker's medical limitations, to perform the sedentary job of surveillance-system monitor. The vocational expert testified that Baker could perform this sedentary work. Tr. at 73-75. Moreover, a comparison of the limitations Baker suffered – "the need for a sit/stand option at will, and limited ability to push and pull with one lower extremity; occasionally balancing, bending, stooping, kneeling, crouching, squatting, climbing stairs and ramps, but never ladders, ropes or scaffolds, or crawling. In the non-dominant (left) hand, there could be no repetitive reaching, handling, fingering, or feeling. . . . [and] avoid[ing] concentrated exposure to cold and hazards [as well as] moderate limitation in the ability to concentrate [and] maintain attention for extended periods and keep up a pace," Tr. at 28 – with the physical requirements of the surveillance-system monitor position – which involve no reaching, handling, fingering, or feeling, but only observing television screens, notifying others by telephone of the need for corrective action, pushing a hold button, and adjusting monitor controls, *see* D.I. 9 App. A at 3 (D.O.T. 379.367-101) – supports the ALJ's conclusion that Baker could perform this work despite his many limitations.

There was substantial evidence, in the form of the vocational expert's unchallenged testimony, that the surveillance-system monitor position represented 300 jobs in the local economy and over 12,000 jobs in the national economy. Tr. at 75. This constituted a significant number of jobs in the national economy justifying a finding of non-disability. *See Craigie v. Bowen*, 835 F.2d

14

56, 58 (3d Cir. 1987) (holding that 200 jobs in the regional economy was a clear indication that there existed in the national economy other substantial gainful work that applicant could perform).

Contrary to these conclusions, Baker argues that the ALJ did not consider all of his medical limitations. He writes: "To complicate matters, Mr. Baker does not simply have one limitation (manipulative limitations) that impacts the full range of sedentary work;" he points out that he also "would need to alternate sitting and standing at will" and suffers from "a moderate limitation in the ability to concentrate, maintain attention for extended periods and keep up a pace." Tr. at 28. The record shows, however, that the ALJ found and credited not just one but multiple limitations. *See, e.g.*, Tr. at 25 ("The claimant self assessed himself with the following functional limitations: can lift 8 to 9 pounds; walk 50 yards; stand for 1/2-1 hours at a time; sit for 1-2 hours at a time; and bend and kneel, and reach overhead. He testified that he has decreased feeling in both his left and right hands, although handling is fine in both. He also testified that he had decreased grip in both hands, and decreased fingering in the right hand. He alleged trouble concentrating about ½ hour out of the day, but that he still can sustain concentration sufficiently enough to watch television, and has the mental acuity to play cards occasionally."). All of these limitations were factored into the vocational expert's testimony that Baker could perform at most only 50% of the sedentary work in the national economy. Tr. at 74. Moreover, again, even considering all of these limitations there is substantial evidence that Baker could, at minimum, perform the job of surveillance-system monitor.

Baker also claims that Social Security Ruling 96-9p (the "Ruling") supports a finding of disability here. The Ruling, which addresses "Residual Functional Capacity for Less Than a Full Range of Sedentary Work," notes that a residual functional capacity "for less than a full range of sedentary work reflects very serious limitations resulting from an individual's medical

impairment(s) and is expected to be relatively rare." Baker emphasizes language from the Ruling to the effect that "[m]ost unskilled sedentary jobs require good use of both hands and the fingers; i.e., bilateral manual dexterity" and "[a]ny significant manipulative limitation of an individual's ability to handle and work with small objects with both hands will result in a significant erosion of the unskilled sedentary occupational base . . . ." Ruling (emphasis added); *see also* Social Security Ruling 83-14 (explaining that "[s]ubstantially all" unskilled sedentary occupations require "good" use of the hands and fingers for "repetitive" hand-finger action). However, Baker acknowledges, as he must, that the Ruling only provides that individuals in his circumstances will be unable to perform "most" sedentary jobs, and that his opportunities will be "significantly eroded." The Ruling expressly states that "the mere inability to perform substantially all sedentary unskilled occupations does not equate with a finding of disability." Furthermore, the Ruling stresses that in cases such as Baker's a particularized analysis must be undertaken and a vocational expert should be consulted – both of which the ALJ did here.[3]

Finally, Baker insists the vocational expert's conclusion that he could perform 50% of sedentary unskilled work in the national economy "is simply not reliable." (D.I. 9 at 11) But even if the Court were to agree, there is substantial evidence in the record to support the expert's and ALJ's more limited conclusion that Baker could at least perform the job of surveillance-system monitor. Indeed, Baker acknowledges in his Reply Brief that "[t]here is no question that Mr. Baker can perform only a very limited range of unskilled sedentary work." (D.I. 12 at 1 (emphasis added)) Because there is substantial evidence that this "very limited range" includes, at least, the position of

---

[3] The ALJ's decision to obtain specific vocational expert testimony was also consistent with both of the Appeals' Council remand orders in this case. Tr. at 345-47.

surveillance-system monitor, the Commissioner has met his burden of proving that Baker is not disabled within the meaning of the Social Security Act.

### 2. There is Substantial Evidence to Support the ALJ's Findings as to the Extent of Limitations of Baker's Use of His Hands

Baker further argues that the Commissioner failed to fully appreciate the true extent of limitations on his hands. While the ALJ focused on the more extensive limitations on Baker's non-dominant left hand, Baker emphasizes on appeal his bilateral – i.e., left and right – limitations.

The record shows that the ALJ noted limitations on both of Baker's hands. *See, e.g.*, Tr. at 24 (noting, among other things, Baker's "right hand disorder and/or left hand disorder has not resulted in him having extreme loss of function of one extremity"); *id.* ("[T]he medical evidence indicates that the claimant had a left hand disorder with neuropathy . . . [and] right hand disorder . . . ."); Tr. at 25 ("[Baker] testified that he has decreased feeling in both his left and right hands, although handling is fine in both. He also testified that he had decreased grip in both hands, and decreased fingering in the right hand."). There is substantial evidence for the ALJ's conclusion that Baker's left hand limitations were substantially greater than the limitations on his use of his right hand. *See, e.g.*, Tr. at 305 (October 1997 medical evaluation finding "very severe" left side abnormalities with ulnar nerve entrapment and only "moderately severe" abnormalities on right side).

Near the conclusion of the administrative hearing, Baker's attorney argued to the ALJ that the evidence established impairments in manual dexterity that were roughly equal in both hands and, therefore, Baker was not able to perform any sedentary work. Tr. at 79-80. The attorney contended: "the testimony has been kind of the same regarding inability for both hands, not just one hand. . . . I

17

think it clearly shows a severe limitation in the use of either hand and as our vocational witness has testified, if we were to have that type of problem [in both hands] that would preclude all work." Tr. at 79-80. The ALJ heard and considered this argument and, based on the record, rejected it. There was, as outlined above, substantial evidence to support the ALJ's decision.

The ALJ further concluded that Baker's "allegations regarding his limitations are not [all] fully credible." Tr. at 28. The ALJ pointed to substantial evidence to support this credibility determination. For example, in Baker's December 6, 1995 Daily Activities Questionnaire, Baker disclosed that he dressed himself daily and cooked for himself. Tr. at 21, 153. Approximately every other week Baker would get together with friends to play cards or board games. Tr. at 154. Outside of the home, he would do some shopping, go to movies, and go to his children's sporting events. Tr. at 154-55. He would watch TV and, when he did so, he could remember what he watched and follow the plots. Tr. at 155. The ALJ's credibility determination, which is the province of the ALJ to make, further supported the ALJ's conclusion about the extent of limitations on Baker's dexterity in each of his hands.

## V. CONCLUSION

Accordingly, for the reasons set forth in this Memorandum Opinion, Baker's motion for summary judgment will be DENIED and the Commissioner's motion for summary judgment will be GRANTED. An appropriate Order follows.